UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___9/30/19___

OSEN LLC,

        Plaintiff,

    -against-

UNITED STATES CENTRAL COMMAND,

        Defendant.

18-CV-6069 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Osen LLC (Osen) brought this action pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, against United States Central Command (CENTCOM), seeking unredacted copies of documents related to attacks on American military personnel in Iraq between 2004 and 2011. Now before the Court are the parties' cross-motions for summary judgment, which turn on the narrow issue of whether CENTCOM properly relied on FOIA Exemption 6, which applies to information that "would constitute a clearly unwarranted invasion of personal privacy" if disclosed, 5 U.S.C. § 552(b)(6), when it redacted the names and photographs of foreign nationals suspected to be malign actors.

For the reasons set forth below, CENTCOM's motion (Dkt. No. 21) will be granted in part, Osen's cross-motion (Dkt. No. 26) will be denied, and the Court will leave the case open for the parties to resolve certain limited outstanding issues discussed below.

I. **BACKGROUND**

A. **Factual Background**

Osen is a law firm, with offices in New Jersey and New York, "that primarily represents victims of international terrorism." Compl. (Dkt. No. 9) ¶ 12. Osen "represents hundreds of U.S. service members and family members of U.S. service members" who were "killed or injured in terrorist attacks while serving in Iraq," alleging "that these attacks were committed by Iranian-

backed terrorists, and that Iran and its corporate enablers are responsible" for its clients' injuries. *Id.* ¶ 2. Osen has filed "several lawsuits against Iran and several Iranian and Western financial institutions that it alleges helped Iran fund, train, and otherwise support the terrorists" who allegedly injured Osen's clients. *Id.*

Osen has also filed several lawsuits in this District against various agencies of the U.S. government, including CENTCOM,[1] seeking the disclosure of government records to assist it in showing "that Iran was responsible for the attacks in which [its clients] were injured." Compl. ¶ 3. *See also Osen LLC v. United States Cent. Command*, No. 1:17-cv-04457-KPF (S.D.N.Y.); *Osen LLC v. Office of Foreign Assets Control of the U.S. Dep't of Treasury*, No. 1:18-cv-03511-JPO (S.D.N.Y.); *Osen LLC v. U.S. Dep't of Commerce, Bureau of Industry and Security*, No. 1:18-cv-06066-PGG (S.D.N.Y.); *Osen LLC v. U.S. Dep't of State*, No. 1:18-cv-06070-JSR (S.D.N.Y.); *Osen LLC v. Office of Foreign Assets Control of the U.S. Dep't of Treasury*, No. 1:19-cv-00405-AJN (S.D.N.Y.); and *Osen LLC v. United States Cent. Command*, No. 1:19-cv-06867-KPF (S.D.N.Y.).

On December 27, 2017 and April 6, 2018, Osen submitted the two sets of FOIA requests at issue in this case. Compl. ¶¶ 7, 25, 31, & Exs. A, C. Those requests sought disclosure of 32 weekly reports from General David Petraeus (the then-commander of U.S. and allied forces in Iraq) to Secretary of Defense Robert Gates in 2007 and 2008, 37 Significant Activities (SIGACT) Reports from 2004 through 2009, and 13 other military or intelligence reports. *Id.* Exs. A, C.

---

[1] Major General Michael Erik Kurilla, CENTCOM's Chief of Staff, explains: "CENTCOM is one of nine combatant commands of the United States armed forces; it directs and enables military operations and activities with allies and partners to increase regional security and stability in support of enduring United States interests within its Area of Responsibility ('AOR'). At present, CENTCOM's AOR includes 20 nations in the Middle East, Central and South Asia, and the strategic waterways that surround them. Prior to 2008, CENTCOM's AOR also included seven African nations." Kurilla Decl. (Dkt. No. 23) ¶ 1.

### B.    Procedural Background

Osen filed its complaint on July 5, 2018, seeking a declaration that "CENTCOM is obligated to provide it with copies of the records sought," and an injunction compelling CENTCOM to provide the same records. Compl. ¶¶ 34-41. Osen alleges, and CENTCOM does not deny, that CENTCOM failed to make a timely "determination" in response to Osen's requests, Compl. ¶ 10, thereby permitting Osen to file suit "without exhausting [its] administrative appeal remedies." *Id.* (quoting *Citizens for Responsibility & Ethics in Washington v. Fed. Election Comm'n*, 711 F.3d 180, 182 (D.C. Cir. 2013)). On August 13, 2018, CENTCOM filed its answer. (Dkt. No. 12.) On August 16, 2018, the parties consented to the jurisdiction of the assigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Dkt. No. 13.) On September 26, 2018, the Court held an initial case management conference and put in place a briefing schedule for the parties to file their anticipated cross-motions for summary judgment. (Dkt. No. 16.)

On December 19, 2018, CENTCOM filed its motion, together with a memorandum of law (Def. Mem.) (Dkt. No. 22) and the Kurilla Declaration, attaching a *Vaughn* index also dated December 19, 2018. (Dkt. No. 23-2.)[2] Major General Kurilla attested that, after CENTCOM released "nearly 400 pages" of records responsive to Osen's requests, the parties narrowed their dispute to "28 pages from the release on which [plaintiff] is challenging one or more of the items of information being withheld." Kurilla Decl. ¶¶ 6-8. As reflected on its *Vaughn* index, CENTCOM redacted information on these 28 pages based on two FOIA exemptions: Exemption

---

[2] "A *Vaughn* index is an itemized listing of the non-disclosed records, describing each record and portion withheld, and providing a detailed justification for the agency's withholding, specifying the applicable FOIA exemption." *Welby v. U.S. Dep't of Health*, 2016 WL 1718263, at *3 n.3 (S.D.N.Y. Apr. 27, 2016) (internal quotation marks and citations omitted).

1, 5 U.S.C. § 552(b)(l) (applicable to properly classified information which the government is authorized to keep "secret in the interest of national defense or foreign policy") and Exemption 6, 5 U.S.C. § 552(b)(6) (applicable to "personnel and medical files," as well as "similar files," the "disclosure of which would constitute a clearly unwarranted invasion of personal privacy"). Kurilla Decl. ¶¶ 11-28, Ex. 2. Under Exemption 6, CENTCOM withheld, among other information, the "[n]ames of persons targeted as, and/or suspected to be, malign actors," as well as "photographs," and "other biographical information" that "could be used to identify such individuals." Kurilla Decl. Ex. 2 §§ 4, 6.

On February 21, 2019, Osen filed its cross-motion for summary judgment, together with a memorandum of law (Pl. Mem.) (Dkt. No. 27) and the declaration of attorney Michael J. Radine (Radine Decl.) (Dkt. No. 28), attaching the "separately-numbered productions CENTCOM produced to Plaintiff that Plaintiff is contesting as including improper redactions" (Exhibits 1-16),[3] as well as a number of publicly-available reports and publications (or excerpts thereof) released by CENTCOM and others (Exhibits 17-31), which are discussed in more detail in section II(C)(4) below. Radine Decl. ¶¶ 2-17.

In its cross-motion papers, Osen informed the Court that the parties had resolved all of their disputes except for one: CENTCOM's withholding, under Exemption 6, of "the names and photographs of malign actors." Pl. Mem. at 10.[4] Osen argues that CENTCOM "has not identified alleged terrorists' reasonable privacy interests," and that any such privacy interests are outweighed by the public's "interest in identifying individuals, groups, and nations responsible for killing U.S.

---

[3] For Exhibits 4-14, Osen included a corresponding unredacted version of the relevant report, sourced from Wikileaks.

[4] Osen does not "dispute the scope of CENTCOM's searches or its good faith in working with counsel to effectuate the document productions," and no longer challenges CENTCOM's redactions pursuant to Exemption 1. Pl. Mem. at 7.

service members in terrorist attacks." *Id.* at 13, 19. Osen also argues that CENTCOM's Exemption 6 redactions have been "inconsistent, idiosyncratic," and "unsupportable," *id.* at 7, and that CENTCOM and the Department of Defense have "routinely released" the names of suspected terrorists in prior publications. *Id.* at 18-19.

On March 20, 2019, CENTCOM filed its reply brief in support of its motion and in opposition to Osen's cross-motion (Def. Reply Mem.) (Dkt. No. 31), together with the supplemental declaration of Major General Kurilla (Supp. Kurilla Decl.) (Dkt. No. 32). Major General Kurilla reported that during the course of this litigation, CENTCOM's FOIA staff had "made additional efforts to evaluate whether" each individual whose name and/or photograph was redacted "was a public figure, a notorious criminal or terrorist whose identity was in the public domain, or deceased, including supplemental searches of open sources of information," and had unredacted several additional names, including several of the specific names at issue in Osen's cross-motion. Supp. Kurilla Decl. ¶¶ 3-5.

On April 4, 2019, Osen filed its reply brief (Pl. Reply Mem.) (Dkt. No. 34). Osen argues that CENTCOM has not sufficiently justified its redactions based on Exemption 6, "particularly given its extensive disclosures elsewhere." Pl. Reply Mem. at 1-6. It also argues that a decision rendered by the Hon. Katherine Polk Failla on March 22, 2019, in a companion case filed by Osen against CENTCOM – which held, in relevant part, that CENTCOM properly relied on Exemption 6 to withhold the names of certain foreign nationals who may have been malign actors involved in attacks on U.S. military personnel – should not compel the same result in this case. *See Osen LLC v. United States Cent. Command*, 375 F. Supp. 3d 409 (S.D.N.Y. 2019) (*Osen I*). The Court will address Judge Failla's ruling in *Osen I* below in section II(B).

## II.    ANALYSIS

### A.    Legal Standards

#### 1.    FOIA

"FOIA was enacted in order to 'promote honest and open government and to assure the existence of an informed citizenry [in order] to hold the governors accountable to the governed.'" *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 355-56 (2d Cir. 2005) (quoting *Grand Cent. P'ship, Inc. v. Cuomo,* 166 F.3d 473, 478 (2d Cir. 1999)). "FOIA strongly favors a policy of disclosure . . . and requires the government to disclose its records unless its documents fall within one of the specific, enumerated exemptions set forth in the Act," which must be narrowly construed. *Nat'l Council of La Raza*, 411 F.3d at 355-56 (citations omitted). "The government bears the burden of demonstrating that an exemption applies to each item of information it seeks to withhold, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure." *Florez v. Cent. Intelligence Agency*, 829 F.3d 178, 182 (2d Cir. 2016) (quoting *Ctr. for Constitutional Rights v. C.I.A.*, 765 F.3d 161, 166 (2d Cir. 2014)). However, "[a]ffidavits or declarations . . . giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden," and such affidavits "submitted by an agency are accorded a presumption of good faith." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 69 (2d Cir. 2009) (quoting *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994)).

FOIA authorizes a complainant from whom agency records have been improperly withheld to bring suit in "the district court of the United States in the district in which the complainant resides, or has his principal place of business . . . ." 5 U.S.C. § 552(a)(4)(B). The district court must then determine the matter *de novo*. *Id.*

## 2.     Resolving FOIA Claims at Summary Judgment

Summary judgment is the usual mechanism for resolving FOIA disputes. *Osen I*, 375 F. Supp. 3d at 417 (citing *N.Y. Times Co. v. U.S. Dep't of Justice*, 235 F. Supp. 3d 522, 529 (S.D.N.Y. 2017)). "A district court in a FOIA case may grant summary judgment in favor of an agency 'on the basis of agency affidavits if they contain *reasonable specificity* of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Grand Cent. P'ship*, 166 F.3d at 478 (quoting *Gallant v. NLRB*, 26 F.3d 168, 171 (D.C. Cir. 1994)) (emphasis in *Grand Cent. P'ship*). "[D]iscovery relating to the agency's search and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are adequate on their face." *Carney*, 19 F.3d at 812. "Conversely, '[s]ummary judgment in favor of the FOIA plaintiff is appropriate when an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption.'" *Osen I*, 375 F. Supp. 3d at 418 (quoting *Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior*, 36 F. Supp. 3d 384, 398 (S.D.N.Y. 2014)).

## 3.     Exemption 6

FOIA's sixth exemption permits the government to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "Exemption 6 is intended to 'protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information.'" *Wood v. F.B.I.*, 432 F.3d 78, 86 (2d Cir. 2005) (quoting *U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 599 (1982)).

"Whether the names and other identifying information about [an individual] may be withheld under Exemption 6 is a two-part inquiry," *Wood*, 432 F.3d at 86:

First, we must determine whether the personal information is contained in a file similar to a medical or personnel file. In considering whether the information is contained in a "similar" file, we ask whether the records at issue are likely to contain the type of personal information that would be in a medical or personnel file. At the second step of the analysis under Exemption 6, we balance the public's need for the information against the individual's privacy interest to determine whether the disclosure of the names would constitute a "clearly unwarranted invasion of personal privacy."

*Id.* (internal citations omitted).

The first step of the inquiry is "not a difficult hurdle to clear, as the Second Circuit considers 'a record . . . a "similar file" if it contains personal information identifiable to a particular person.'" *Osen I*, 375 F. Supp. 3d at 423 (quoting *Cook v. Nat'l Archives & Records Admin.*, 758 F.3d 168, 175 (2d Cir. 2014)). *See also Washington Post*, 456 U.S. at 602 ("[T]he exemption was intended to cover detailed Government records on an individual which can be identified as applying to that individual.") (citations omitted).

At the second step, "[t]he balancing analysis for FOIA Exemption 6 requires that [courts] first determine whether disclosure of the files would compromise a substantial, as opposed to a *de minimis*, privacy interest, because if no substantial privacy interest is implicated FOIA demands disclosure." *Seife v. U.S. Dep't of State*, 366 F. Supp. 3d 592, 610 (S.D.N.Y. 2019) (quoting *Cook*, 758 F.3d at 175-76). However, "[t]he privacy interests protected by the exemptions to FOIA are broadly construed." *Associated Press v. U.S. Dep't of Justice*, 549 F.3d 62, 65 (2d Cir. 2008). "Personal information, including a citizen's name, address, and criminal history, has been found to implicate a privacy interest cognizable under the FOIA exemptions." *Id.*

"Where an agency has demonstrated a privacy interest sufficient to implicate Exemption 6, the burden falls to the requesting party to establish that disclosure 'would serve a public interest cognizable under FOIA.'" *Seife*, 366 F. Supp. 3d at 610 (quoting *Associated Press*, 549 F.3d at 66). "The only public interest found to be relevant in FOIA balancing is 'the extent to which

disclosure would serve the core purpose of the FOIA, which is contribut[ing] significantly to public understanding of the operations or activities of the government.'" *Associated Press*, 549 F.3d at 66 (quoting *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 495 (1994)). The requester's individual purpose or motive in seeking the information "has no bearing on the merits of his or her FOIA request." *Fed. Labor Relations Auth.*, 510 U.S. at 487 (quoting *U.S. Dep't of Justice v. Reporters' Comm. for Freedom of the Press*, 489 U.S. 749, 771 (1989)).

### 4. Collateral Estoppel

"Collateral estoppel, or issue preclusion, prevents the relitigation of an issue that was raised, litigated, and actually decided by a judgment in a prior proceeding." *GemShares, LLC v. Kinney*, 2017 WL 2559232, at *8 (S.D.N.Y. June 2, 2017) (quoting *Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 734 (2d Cir. 1991)). "In order to establish that an issue was determined in a former adjudication, a party asserting collateral estoppel must establish four things: (1) the issues in the prior proceeding and the current proceeding are identical; (2) the issue raised in the current action was, in fact, actually decided in the prior proceeding; (3) there was a full and fair opportunity to litigate the issue in the prior proceeding; and (4) the issue previously litigated and decided was necessary to support a valid and final judgment on the merits." *Id.* (citing *In re PCH Assocs.*, 949 F.2d 585, 593 (2d Cir. 1991)).

These principles apply in FOIA actions to prohibit relitigation of issues previously determined in earlier FOIA actions between the same parties. *See, e.g.*, *Nat'l Treasury Employees Union v. I.R.S.*, 765 F.2d 1174, 1177 (D.C. Cir. 1985); *Hall v. C.I.A.*, 2005 WL 850379, at *3 (D.D.C. Apr. 13, 2005). In *Nat'l Treasury Employees Union*, a complainant brought a first FOIA action against the IRS, seeking disclosure of the "Senior Executive Performance Objectives and Expectations (Form 6419) for the period 1980-1981." 765 F.2d at 1175. That case resulted in a

final judgment "ordering release of the documents 'except for those portions . . . which identify specific individual employees of the IRS.'" *Id.* The same complainant – who did not appeal that judgment – then brought a second FOIA suit against the IRS, seeking disclosure of the same forms "for the succeeding year, July 1, 1981, to June 30, 1982." *Id.* After the IRS disclosed those forms, with the "same kind" of information redacted as had been "ordered deleted" in the first action, *id.* at 1177 n.7, the parties filed cross-motions for summary judgment. *Id.* at 1175. The district judge "observed that he was being asked to consider 'the same issue . . . simply in a successive year,'" and that "another judge of the same court had already given the issue 'her best consideration,' and had 'articulated the reasons she found the way she did.'" *Id.* He therefore "follow[ed] her decision" and dismissed the case. *Id.*

In an opinion authored by then-Judge Ruth Bader Ginsburg, the D.C. Court of Appeals agreed and affirmed on the basis of collateral estoppel:

> The Union and Ferris chose to pass up the opportunity they had to appeal to this court from the judgment entered in the first action. There has been no change favorable to the Union in the legal climate; the FOIA requests in the two actions are identical except for the year involved; the same courts and the same procedures are implicated; no overriding public concern warrants allowing the Union to start over; and the continuing character of the Union's interest was foreseeable at the time of the initial action. . . .
>
> In sum, the Union and Ferris had a fair opportunity to present the contention they would air again; they did not avail themselves of the right to appeal from the judgment in the first action; they are not entitled to a second judgment on the merits of the issue they wish to reargue.

765 F.2d at 1177-78 (citations and footnotes omitted).

A district court may raise the issue of collateral estoppel *sua sponte*. *Curry v. City of Syracuse*, 316 F.3d 324, 331 (2d Cir. 2003) ("we have previously upheld a district court's dismissal of a case on collateral estoppel grounds even where collateral estoppel was not raised as an affirmative defense in the answer, but was raised by the district court *sua sponte,* without

permitting the party against which it was asserted an opportunity to argue the issue"); *Doe v. Pfrommer,* 148 F.3d 73, 80 (2d Cir. 1998) (affirming *sua sponte* application of collateral estoppel in motion for summary judgment). *See also Grieve v. Tamerin*, 269 F.3d 149, 154 (2d Cir. 2001) (affirming district court's dismissal on collateral estoppel grounds notwithstanding a defendant's failure to plead that defense in her answer, and noting that "principles of preclusion involve" not only "the rights and interests of the parties," but also "important interests of the public and the courts in avoiding repetitive litigation and potentially inconsistent decisions").

**B.** *Osen I*

Osen filed *Osen I* on June 13, 2017, challenging CENTCOM's redactions on "approximately 900 pages" of "records regarding 92 attacks on U.S. servicemembers in Iraq that occurred between 2004 and 2011." *Osen I*, 375 F. Supp. 3d at 414, 416. Those records included, among others, SIGACT Reports, though none of the specific SIGACT Reports at issue here. Pl. Reply Mem. at 6. After CENTCOM reprocessed a number of documents, the parties resolved all of their disputes except for CENTCOM's withholding of three categories of information, one of which was "the names of foreign nationals who were captured on the battlefield, were interrogated in connection with EFP attacks, were suspected of involvement in EFP attacks, or provided information to the U.S. government and its agents." *Osen I*, 375 F. Supp. 3d at 416; *see also id.* at 424.[5] Relying on Exemption 6, CENTCOM withheld those individuals' names, "telephone numbers, email addresses, biometric information, familial relationships, and other descriptive information that could lead to their identification," *id.* at 416, stating that "exposure of such

---

[5] Explosively Formed Penetrators (EFPs) are "a particular type of Improvised Explosive Device ('IED')," apparently involved in attacks on Osen's clients. *Osen I*, 375 F. Supp. 3d at 413.

information could result in a number of potentially serious harms to these individuals, and there is no general public interest in the disclosure of this information." *Id.*

During the course of the summary judgment proceedings, CENTCOM agreed to remove redactions regarding four specified individuals, as well as redactions regarding "any remaining references to the names of terrorist groups, public figures . . . and 'already exposed names' within particular records, that continue to be withheld pursuant to Exemption 6[.]" *Osen I*, 375 F. Supp. 3d at 424 (alterations in the original). Osen, in turn, narrowed its request to "the disclosure of the 'names of terrorists other than [the] four Plaintiff specifically identified in its opening brief.'" *Id.* at 425.[6]

Judge Failla held that CENTCOM's reliance on Exemption 6 to withhold those names "present[ed] a straightforward case for redaction: The redacted material is personally identifying, disclosure poses risks for the individuals, and the public's interest in disclosure is minimal." *Osen I*, 375 F. Supp. 3d at 424. Applying the two-step balancing test set out in *Wood,* she concluded that "the individuals whose identifying information has been redacted" had "a privacy interest in that information," *id.* at 425-26, and that disclosure of the names would not "serve the public interest by advancing 'the core purpose of the FOIA,'" *id.* at 427 (quoting *Reporters' Comm.*, 489 U.S. at 775), because it would not "inform the public on Government agencies' performance of their missions and how they conduct operations or activities." *Id.*[7] Judge Failla also rejected Osen's

---

[6] Osen "repeatedly and continuously" referred to the individuals whose names were redacted as "terrorists." *Osen I*, 375 F. Supp. 3d at 425. CENTCOM resisted this characterization, explaining that it was "possible, but by no means certain, that the individuals identified as perpetrators" in the documents in issue "actually were involved in hostile acts." *Id.*

[7] Judge Failla took care to explain that she was making a legal judgment, not a value judgment, in characterizing Osen's purpose in bringing its FOIA action: "Civil litigation can certainly serve the public by enforcing the laws and holding governments, corporations, and individuals accountable for misconduct. It is no insult to suggest that Plaintiff hopes to further its litigation efforts by

argument that the U.S. government's "prior disclosures of names of individuals linked to attacks in Iraq" required disclosure of the redacted individual names, because there was "no suggestion that CENTCOM," as opposed to another government agency, "has disclosed these names in any manner," and because Osen offered nothing more than a "mere assertion that existing [public] lists of individuals may overlap with the redacted individuals." *Id.* at 426-27.

CENTCOM appealed Judge Failla's March 22, 2019 Opinion and Order on other grounds; that appeal remains pending. *See Osen LLC v. United States Cent. Command*, No. 19-1577 (2d Cir. May 24, 2019). However, Osen did not appeal the ruling concerning CENTCOM's application of Exemption 6 to redact the names of suspected terrorists.

## C.    Application

### 1.    CENTCOM's Case for Redaction

Here, as in *Osen I*, CENTCOM has relied on Exemption 6 to withhold the names and other personally identifying information of foreign nationals suspected of involvement in attacks on Americans in Iraq. *Compare* Kurilla Decl. Ex. 2 § 4 (CENTCOM redacted the "[n]ames of persons targeted as, and/or suspected to be, malign actors") to *Osen I*, 375 F. Supp. 3d at 424 (CENTCOM redacted the "names and/or other identifying information" of individuals who were "suspected of involvement in particular EFP attacks"). Similarly, as in *Osen I*, CENTCOM has "present[ed] a straightforward case for redaction: The redacted material is personally identifying, disclosure poses risks for the individuals, and the public's interest in disclosure is minimal." *Osen I*, 375 F. Supp. 3d at 424.

---

gaining this information, but it is not a core purpose of FOIA to advance the goals of civil litigants, no matter how noble the litigants' intentions." *Osen I*, 375 F. Supp. 3d at 427.

According to Major General Kurilla, "CENTCOM applied FOIA Exemption 6 to information regarding third-party foreign nationals," including the names and identifying details of "personnel targeted as, and/or suspected to be, malign actors," Kurilla Decl. ¶ 26 (citations to Bates-numbered documents omitted), because "[p]ublic disclosure of the names and/or other identifying information of these third party individuals could result in a wide range of potential harms," including, for "[i]ndividuals whose names are associated with American military efforts in lraq," potential "harassment, retaliation, or other types of reprisals depending on the roles depicted in the challenged records," as well as "undue attention by the public," particularly for "individuals who may have been suspected, but never formally charged or convicted, of involvement in certain hostile activities." *Id.* ¶ 27. Major General Kurilla also asserts that there is "no cognizable public interest in the disclosure of the names and other identifying information regarding the third-party individuals described above" because the disclosure of that information "would not inform Plaintiff or the general public about CENTCOM's performance of its mission and/or how CENTCOM actually conducts its operations or activities." *Id.* ¶ 28.

### 2. Osen's Contentions

As in *Osen I*, Osen does not challenge the first step of the test under Exemption 6, *i.e.*, that the military and intelligence reports it requests are "similar files." Pl. Mem. at 12. However, it argues that the balancing test under Exemption 6 does not authorize CENTCOM's redactions of the names and photographs of the suspected malign actors (the Redacted Individuals). In addition, Osen contends that CENTCOM's prior disclosures of some of those names and/or photographs (or

the names and/or photographs of other malign actors) waives its entitlement to invoke Exemption 6 here. Pl. Mem. at 12-21; Pl. Reply Mem. at 1-10.[8]

The Court concludes that Osen's challenge to CENTCOM's application of Exemption 6 is barred by principles of collateral estoppel, and that even if it were not, that challenge would fail on the merits. The Court also concludes that it cannot adjudicate Osen's second challenge on the present record.

### 3. CENTCOM's Withholdings Pursuant to Exemption 6 Were Proper

#### a. *Collateral Estoppel Bars Relitigation of the Exemption 6 Issue*

The Court first considers the preclusive effect of *Osen I*. As noted above, the application of collateral estoppel requires the establishment of four elements: "(1) the issues in the prior proceeding and the current proceeding are identical; (2) the issue raised in the current action was, in fact, actually decided in the prior proceeding; (3) there was a full and fair opportunity to litigate the issue in the prior proceeding; and (4) the issue previously litigated and decided was necessary to support a valid and final judgment on the merits." *GemShares*, 2017 WL 2559232, at *8.

The Exemption 6 issue that Osen seeks to raise here – whether CENTCOM was entitled to rely on that exemption to redact the names and identifying information of suspected malign actors in Iraq – is identical to the Exemption 6 issue that was decided in *Osen I*, after Osen had a full and fair opportunity to litigate it, and was necessary to support Judge Failla's final judgment on the

---

[8] Osen argues that CENTCOM's prior disclosures should also impact the Court's determination about whether the Redacted Individuals have a valid privacy interest. *See, e.g.*, Pl. Mem. at 18-19 (noting that, "despite CENTCOM's stated concern 'for individuals who may have been suspected, but never formally charged or convicted, of involvement in certain hostile activities,'" CENTCOM and other subcomponents of the Department of Defense have "released names of suspected terrorists in countless documents"). However, the privacy interest at stake under Exemption 6 "belongs to the individual, not the agency holding the information." *Associated Press v. U.S. Dep't of Def.*, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005) (quoting *Sherman v. U.S. Dep't of the Army*, 244 F.3d 357, 363 (5th Cir. 2001)). The Court therefore addresses Osen's "prior disclosure" argument separately, after conducting the balancing test set out in *Wood*, 432 F.3d at 86.

merits, which Osen has not appealed. Judge Failla decided each element of the balancing test set out in *Wood*, 432 F.3d at 86, and concluded both that the suspected malign actors had a privacy interest in their names and identifying information, and that disclosure of that information would not advance "the core purpose of the FOIA":

> The Court determines that the individuals whose identifying information has been redacted have a privacy interest in that information. . . . The Court does not consider the potential reputational damage or the risk of violence to individuals who are identified based on uncorroborated intelligence reports to be "mere possibilit[ies]." . . . None of these individuals has consented to disclosure, and the Court does not believe they have forfeited a right to their privacy by virtue of the seriousness of the alleged conduct. . . .
>
> The Court also does not find that disclosure of these names would serve the public interest by advancing "the core purpose of the FOIA." The Supreme Court has held that the core purpose of FOIA is to inform the public on Government agencies' performance of their missions and how they conduct operations or activities. The names here may provide additional material connecting Iran to attacks on American soldiers, but it is not clear how the material would add to public understanding of how CENTCOM operates. Plaintiff suggests that the material would "shed light on the U.S. government's and CENTCOM's conduct of the war and peacekeeping operations in Iraq – and to what extent the U.S. should hold Iran responsible for attacks on its forces." Plaintiff does not attempt to demonstrate how the personally identifying information would reveal new information about the former, or how the latter is a core purpose of FOIA. Furthermore, the Iranian-proxy groups that Plaintiff discusses throughout have been disclosed, and public information already has revealed Iran's role in backing militia groups across Iraq. Plaintiff does not explain why identifying individual alleged members of any of these groups would provide greater insight into CENTCOM's efforts to counter Iran.

*Osen I*, 375 F. Supp. 3d at 425-27 (citations omitted).

To be sure, the specific reports requested by Osen in this case are not identical to those in *Osen I*.[9] However, the underlying legal issues – whether the Redacted Individuals have a privacy interest, whether disclosure of their names would further the "core purpose of the FOIA," and

---

[9] Osen acknowledges that *Osen I* involved some of the same types of reports in this case (including SIGACT Reports), and that CENTCOM "provided the same justification for redacting certain names (i.e., possible retaliation and undue attention)" in both actions. Pl. Reply Mem. at 6.

whether, on balance, CENTCOM was entitled to apply Exemption 6 as it did – are the same. *See Hall*, 2005 WL 850379, at *3 (holding that the prior FOIA judgment "close[d] several doors" because it barred re-litigation of issues which were "in substance the same").[10]

Significantly, Osen does not contend otherwise. Aside from the "corroborating evidence" it suggests links some of the Redacted Individuals to "terrorists acts and groups," and the prior disclosures by CENTCOM discussed below in section II(C)(4), *see* Pl. Reply Mem. at 6-8, it has not presented this Court with any factual or legal differences between this case and *Osen I* which compel revisiting Judge Failla's judgment, nor any intervening changes in the law which are favorable to its position. *See Nat'l Treasury Employees Union*, 765 F.2d at 1177 ("There has been no change favorable to the Union in the legal climate; the FOIA requests in the two actions are identical except for the year involved; the same courts and the same procedures are implicated; no overriding public concern warrants allowing the Union to start over; and the continuing character

---

[10] *But see Platsky v. National Security Agency*, No. 1:15-cv-1529 (S.D.N.Y. April 7, 2015), *vacated in part*, No. 15-1464 (2d Cir. July 16, 2015). In *Platsky*, the district court dismissed a FOIA action on collateral estoppel grounds where it (incorrectly) understood the plaintiff to seek "a subset of the documents" (dated between January 1, 2000 and January 1, 2005) which the same plaintiff had sought, unsuccessfully, in a prior FOIA action. *Id.*, slip op. at 4-5. The Second Circuit vacated in part, explaining: "The Appellant's previous [FOIA] action addressed Appellant's requests for records covering the period January 1, 2005 to January 1, 2010, not January 1, 2000 to January 1, 2010 as the district court concluded. Thus, contrary to the district court's collateral estoppel ruling, the 'legal question' of whether the defendants properly issued *Glomar* responses to Appellant's FOIA requests for records between January 1, 2000 and January 1, 2005, which is at issue in this case, was not 'actually litigated and decided' in the first FOIA action." *Platsky*, No. 15-1464, slip. op. at 1-2. Importantly, one of Platsky's arguments for disclosure – that the records he sought "should be declassified because they are more than ten years old," *id.* at 2 – was not (and could not have been) resolved in the first action. The Court therefore does not read the Second Circuit's unpublished order in *Platsky* as holding that collateral estoppel in FOIA actions requires the exact identity of each document requested. *See also Zherka v. City of New York*, 459 F. App'x 10, 13 (2d Cir. 2012) (quoting *ITT Corp. v. United States,* 963 F.2d 561, 564 (2d Cir. 1992)) ("To meet the identity-of-issues prong of collateral estoppel, it is not necessary that the issues be exactly identical; it is sufficient that 'the issues presented in [the earlier litigation] are substantially the same as those presented by [the later] action.'").

of the Union's interest was foreseeable at the time of the initial action."); *Berlitz Sch. of Languages of Am., Inc. v. Everest House*, 619 F.2d 211, 216 (2d Cir. 1980) (affirming district court's determination that an action was barred by *res judicata* and collateral estoppel where the factual differences between the case at bar and the prior action were "not so great as to warrant another judicial proceeding"). Moreover, because the issue presented for decision here is privacy, not classification, the passage of time, standing alone, does not alter the legal calculus.[11]

Instead, Osen simply "disagrees" with Judge Failla's decision, Pl. Reply Mem. at 10, raising a series of policy arguments – all variants on the arguments presented in *Osen I* – as to why, in its view, disclosing the names of the "alleged terrorists" would constitute a public benefit. *See, e.g.*, *id.* at 10 ("[D]isclosure would also provide the families of U.S. service members injured or killed in terrorist attacks the names of those who helped perpetrate those attacks, which Plaintiff submits is a profoundly compelling public interest."). The Court therefore concludes that principles of collateral estoppel bar relitigation of CENTCOM's application of Exemption 6 here.

Even if collateral estoppel did not apply, however, the Court would reach the same conclusion as *Osen I* on the merits: that CENTCOM properly applied Exemption 6 because the Redacted Individuals have a valid privacy interest in their names and other identifying details and because disclosure of that information would not advance the core purpose of FOIA.

### b. The Redacted Individuals Have a Valid Privacy Interest

It is "well established that identifying information such as names, addresses, and other personal information falls within the ambit of privacy concerns under FOIA." *Associated Press v.*

---

[11] *Cf. Platsky*, No. 15-1464, slip op. at 2 (where present FOIA action involved records dated 2000-2005, and where appellant argued that they should be declassified "because they are more than ten years old," action was not barred by prior FOIA judgment involving similar records dated 2005-2010).

*U.S. Dep't of Def.*, 554 F.3d 274, 285 (2d Cir. 2009). Osen does not dispute this general principle, but argues that CENTCOM has shown nothing more than a "mere possibility" of risks of potential harassment of or retaliation to the Redacted Individuals if their names and/or photographs are disclosed. Pl. Mem. at 14 (citing *Dep't of Air Force v. Rose*, 425 U.S. 352, 381 n.16 (1976)). *See also Rose*, 425 U.S. at 381 n.16 ("Exemption 6 was directed at threats to privacy interests more palpable than mere possibilities."). Osen also alleges that by "participat[ing] in such heinous crimes," the Redacted Individuals "forfeited any right to privacy." Pl. Mem. at 14.

Neither argument is compelling. As a preliminary matter, CENTCOM has already reprocessed its document production to reveal the names of "public figure[s]" and "notorious criminal[s]" and terrorists. Supp. Kurilla Decl. ¶ 5. The Redacted Individuals include "individuals who may have been suspected, but never formally charged or convicted, of involvement in certain hostile activities." Kurilla Decl. ¶ 27; *see also* Supp. Kurilla Decl. ¶ 8 ("Certain records from which information has been withheld pursuant to Exemption 6 consist of intelligence information that remained subject to corroboration at the time the record was generated, or unevaluated intelligence reports that simply report what detainees or other individuals communicated to American forces. It is possible, but by no means certain, that the individuals identified as perpetrators in these documents actually were involved in hostile acts against American and coalition forces. CENTCOM does not know what has become of most of the individuals identified in these records, including whether any of these individuals may currently be aligned with the United States, or the potential ramifications that could result from the disclosure of the names of the individuals withheld in these records."). As in *Osen I*, the Court "does not consider the potential reputational damage or the risk of violence to individuals who are identified based on uncorroborated intelligence reports to be 'mere possibilities.'" *Osen I*, 375 F. Supp. 3d at 426.

Nor has Osen cited any authority for the proposition that an individual suspected of crimes of terrorism "forfeits" her right to privacy for purposes of Exemption 6. *See* Pl. Mem. at 14. "[E]ven convicted defendants" – which the remaining Redacted Individuals do not appear to be – retain a privacy interest in their names and other identifying information for purposes of FOIA. *Pinson v. U.S. Dep't of Justice*, 202 F. Supp. 3d 86, 100 (D.D.C. 2016) (quoting *ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 7 (D.C. Cir. 2011)).[12] As in *Osen I*, therefore, the remaining Redacted Individuals "have a privacy interest in that information." *Osen I*, 375 F. Supp. 3d at 425-26.

### c.   *Disclosure of the Redacted Individuals' Names and Photographs Would Not Advance the Core Purpose of the FOIA*

Having determined that the Redacted Individuals have a privacy interest in their names and photographs, the Court must "balance[] the public's need for the information against th[ose] individual[s'] privacy interest[s] to determine whether the disclosure . . . would constitute a 'clearly unwarranted invasion of personal privacy.'" *Wood*, 432 F.3d at 86 (citing 5 U.S.C. § 552(b)(6)).

As in *Osen I*, Osen relies heavily on a 2017 decision from the Southern District of Florida – *Broward Bulldog, Inc. v. U.S. Dep't of Justice*, 2017 WL 2119675 (S.D. Fla. May 16, 2017) – for the proposition that the public has an interest in "determining who is behind terrorist attacks against Americans." Pl. Reply Mem. at 6-9; *see also* Pl. Mem. at 13, 19, 21 (discussing *Broward Bulldog*). In *Broward Bulldog*, the court held in relevant part that there was a "significant public interest" in disclosure of the individual names of persons who may have been involved in the

---

[12] Therefore, Osen's "corroborating evidence" that these individuals are indeed malign actors, Pl. Reply Mem. at 7, is immaterial. *See Osen I*, 375 F. Supp. 3d at 425 ("These individuals may indeed be responsible for serious crimes or attacks against U.S. forces, but their involvement remains unproven *and is ultimately irrelevant* to the determinations of this Court.") (emphasis added). Moreover, much of that evidence relates not to the names that remain redacted but rather to names that CENTCOM disclosed to Osen – months before Osen filed its cross-motion – as belonging to public figures or notorious criminals or terrorists. Pl. Mem. at 14-18; Supp. Kurilla Decl. ¶¶ 3-5.

September 11, 2001 terrorist attacks. 2017 WL 2119675, at *12. However, on September 23, 2019, the Eleventh Circuit reversed that portion of the district court's order:

> The public's interest in "having the information for its own sake" falls outside the Act's scope. *Id.* Instead, "the only relevant public interest in the . . . balancing analysis [is] the extent to which disclosure of the information sought would she[d] light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." A bare interest in learning who may have been involved in the 9/11 attacks "falls outside the ambit of the public interest that the [Act] was enacted to serve."

*Broward Bulldog, Inc. v. U.S. Dep't of Justice*, 2019 WL 4593316, at *13 (11th Cir. Sept. 23, 2019) (citations omitted). The Eleventh Circuit acknowledged that the public might have "some" interest in disclosure of the identifying information at issue – which could "reveal how the government took action with respect to certain leads," or permit media outlets "to contact individuals involved in the investigation" – but held that those were not "significant public interest[s] that can outweigh the strong privacy interests in the clearly identifying information at issue." *Id.*, at *14.

Osen cites no case other than *Broward Bulldog* for its proposition that "there is a weighty public interest," for FOIA purposes, "in determining who is behind terrorist attacks against Americans." Pl. Reply Mem. at 8. For the same reasons set forth in *Osen I*, therefore, the Court concludes that revealing the names and photographs of the Redacted Individuals would not advance the core purpose of the FOIA.[13]

---

[13] Osen also argues that because some suspected terrorists now hold positions of political power in Iraq, disclosure of their names would inform the public of the "role these alleged terrorists now enjoy in Iraq, occasionally with the support of U.S. tax dollars or U.S. military support." Pl. Reply Mem. at 8-10. However, CENTCOM has already reprocessed its document production to reveal the names of "public figure[s]" and "notorious criminal[s]" and terrorists. Supp. Kurilla Decl. ¶ 5. Osen has not explained how revealing the additional names of individuals who are neither "public figures" in Iraq, nor notorious criminals or terrorists, would further this interest.

As a result, "the privacy interests of the redacted individuals outweigh any claim regarding public interests," and CENTCOM was entitled to rely on Exemption 6 to redact the names of the Redacted Individuals under that exemption. *See also Osen I*, 375 F. Supp. 3d at 427.

### d. *The Redactions Are Not Unduly Inconsistent*

Osen makes one additional argument in challenging CENTCOM's Exemption 6 redactions: that "the redactions made have been inconsistent, idiosyncratic and – in the specific instances at issue – unsupportable." Pl. Mem. at 7. For instance, it points to one instance in which CENTCOM redacted "places and organizations" under the guise of redacting the names of living people. Pl. Reply Mem. at 4.

Those inconsistencies do not rise to the level of "contradictory evidence in the record" or "evidence of agency bad faith" sufficient to justify a wholesale rejection of CENTCOM's application of Exemption 6. *Grand Cent. P'ship*, 166 F.3d at 478; *see also Schwartz v. Dep't of Def.*, 2017 WL 78482, at *20 (E.D.N.Y. Jan. 6, 2017) (quoting *Clemente v. F.B.I.*, 741 F. Supp. 2d 64, 88 (D.D.C. 2010)) ("'[M]inor inconsistencies' in an agency's invocation of FOIA exemptions 'are unsurprising and practically inevitable.'"); *Diamond v. Fed. Bureau of Investigation*, 532 F. Supp. 216, 228 (S.D.N.Y. 1981) ("even if plaintiff had established inconsistencies in defendants' handling of some of the exemptions, it does not follow that other of the exemptions are necessarily not justified"), *aff'd sub nom. Diamond v. F.B.I.*, 707 F.2d 75 (2d Cir. 1983). However, as to the specific example of CENTCOM's application of Exemption 6 to "places and organizations," rather than individuals, the Court will direct the parties to meet and confer regarding any such outstanding issues and provide an update to the Court in the event they are unable to resolve them.

### 4. CENTCOM's Prior Disclosures of the Names or Photographs of the Redacted Individuals, if any, May Warrant Further Disclosure

Osen also contends that CENTCOM and other subcomponents of the Department of Defense "have routinely released names of suspected terrorists" in prior public disclosures, including in the form of "wartime pressers," Tactical Interrogation Reports, the Official Iraq War History, and the CENTCOM Iraq War Papers (referred to collectively herein, as in Osen's briefs, as the CENTCOM Releases). Pl. Mem. at 6-9.[14]

The Tactical Interrogation Reports of Qais Khazali – seven of which Osen submitted to this Court, *see* Radine Decl. Exs. 17-23 – were declassified by CENTCOM on April 6, 2018, released to the public on or before August 30, 2018, and "provide names and photographs of dozens of suspected Iranian terrorists." Pl. Mem. at 7; Radine Decl. Exs. 17-23. *See also* Josh Rogin, *Iraqi terrorist turned politician told U.S. interrogators he worked with Iran to kill Americans*, Washington Post, Aug. 30, 2018. On or about January 17, 2019, the U.S. Army War College released "The U.S. Army in the Iraq War" (the Official History), together with the "CENTCOM Iraq Papers," each of which contains unredacted names and photographs of suspected and/or confirmed terrorists (though the CENTCOM Iraq Papers also contain some

---

[14] As Osen acknowledges, Pl. Reply Mem. at 6, *Osen I* held that "prior disclosures of names of individuals linked to attacks in Iraq" by other departments of the U.S. government did not "require disclosure of the redacted individuals' names" by CENTCOM. 375 F. Supp. 3d at 426. This Court agrees, and addresses only CENTCOM's prior disclosures. *See Marino v. Drug Enf't Admin.*, 685 F.3d 1076, 1082 (D.C. Cir. 2012) (quoting *Frugone v. C.I.A.*, 169 F.3d 772, 774 (D.C. Cir. 1999)) ("an agency does not waive its right to invoke an otherwise valid FOIA exemption when 'someone other than the agency from which the information is being sought' discloses it"); *see also Osen LLC v. U.S. Dep't of State*, 360 F. Supp. 3d 258, 265 n.5 (S.D.N.Y. 2019) (Wikileaks' leak of government information, without more, is not an "official acknowledgment" requiring disclosure of that information in subsequent FOIA action). For the same reason, the Court concludes that uncorroborated media reports about Redacted Individuals (including the "Erbil 5," *see* Pl. Mem. at 19; Supp. Kurilla Decl. ¶ 6) do not, without more, prohibit CENTCOM's reliance on Exemption 6 to redact those individuals' names.

privacy redactions). Pl. Mem. at 6-9; Radine Decl. Exs. 24-28, 31. *See also CENTCOM IRAQ Papers*, U.S. Army Heritage & Education Center, https://ahec.armywarcollege.edu/CENTCOM-IRAQ-papers/index.cfm (last visited September 30, 2019). The "wartime presser" Osen refers to is a Situational Update presented by Brigadier General Kevin J. Bergner, dated July 2, 2007, revealing the names and photographs of certain "suspected terrorists." Radine Decl. ¶ 15, Ex. 29. Osen argues that the CENTCOM Releases were not available to it during the briefing of *Osen I*, but had they been, "it may have changed the result." Pl. Reply Mem. 6.

As explained above, CENTCOM's prior disclosures of the names of some suspected terrorists does not prohibit it from relying on Exemption 6 to redact the names of other suspected terrorists, because the privacy interest at stake under Exemption 6 "belongs to the individual, not the agency holding the information." *Associated Press*, 395 F. Supp. 2d at 19. However, to the extent Osen contends that CENTCOM has previously disclosed the names and/or photographs of the specific individuals redacted here, that contention, if true, could bar CENTCOM from invoking Exemption 6 here.

Under the "official acknowledgment" doctrine (also sometimes referred to as the public domain doctrine), an agency's prior release of information into the public record may prohibit that agency from later withholding the same information based on an otherwise valid FOIA exemption. *See Wolf v. C.I.A.*, 473 F.3d 370, 378 (D.C. Cir. 2007) (quoting *Fitzgibbon v. C.I.A.*, 911 F.2d 755, 765 (D.C. Cir. 1990)) ("when information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim"). However, the information sought must be substantially the same as the information previously released. *See Wolf*, 473 F.3d at 378 ("Prior disclosure of similar information does not suffice; instead, the specific information sought by the plaintiff must already be in the public domain by official disclosure."); *Osen I*, 375

F. Supp. 3d at 421 (concluding that CENTCOM's prior release of an EFP strike photograph did not require the release of all such photographs).[15]

Under the official acknowledgment doctrine, the requester carries "the burden of production on the issue of whether the sought after documents are publicly available." *DiGirolamo v. Drug Enf't Admin.*, 2017 WL 4382097, at *7 (S.D.N.Y. Sept. 29, 2017); *Conti v. U.S. Dep't of Homeland Sec.*, 2014 WL 1274517, at *21 (S.D.N.Y. Mar. 24, 2014). *See also Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1279 (D.C. Cir. 1992) (quoting *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983)) ("plaintiff[s] asserting a claim of prior disclosure must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld"); *Grandison v. U.S. Dep't of Justice*, 600 F. Supp. 2d 103, 116 (D.D.C. 2009).

Osen has not met that initial burden of production, because it has failed to identify specific information, released by CENTCOM, which is identical to the redacted names and photographs at issue here. *See, e.g.*, *Conti*, 2014 WL 1274517, at *21 (finding that a plaintiff did not meet his burden of production to show that the names DHS redacted had entered the public domain through released deposition transcripts where he cited "only one specific section of deposition testimony from one deposition," and the information in that deposition was not identical to the information being withheld). *See also Osen I*, 375 F. Supp. 3d at 426-27 ("The mere assertion that existing lists of individuals may overlap with the redacted individuals does not demonstrate that CENTCOM

---

[15] CENTCOM notes that certain of its prior official releases were made pursuant to a Mandatory Declassification Review (MDR) process, which "involves requests for the declassification of records of a certain age made by other government agencies." Def. Reply Mem. at 7; Kurilla Supp. Decl. ¶ 9. Those requests, according to CENTCOM, do not "specify anything regarding privacy considerations for any named individuals." Def. Reply Mem. at 7-8; Kurilla Supp. Decl. ¶ 9. That may be; however, CENTCOM cites no authority for the proposition that its prior public disclosure of information does not qualify as an official acknowledgment of the material disclosed for FOIA purposes, or does not place that material into the public domain, simply because that prior disclosure occurred through the MDR process.

has disclosed any names that remain redacted."). Osen concedes that it has not performed a comprehensive review of information in the public domain in order to point "to specific information in the public domain that appears to duplicate that being withheld," *Davis*, 968 F.2d at 1279, when it asserts that "*CENTCOM* has also not checked the names in its various disclosures against the names redacted in the records at issue." Pl. Reply Mem. at 7 (emphasis added); *see also* Pl. Mem. at 20 ("Names can be compared to the dozens of names CENTCOM *released* in the TIRs, the Iraq War Papers, news stories or elsewhere.") (emphasis in original). "[G]rudging though it may be," the law places the initial burden on Osen to conduct such a comparison. *Davis*, 968 F.2d at 1279. *See also Conti*, 2014 WL 1274517, at *21 (citing *Davis* and finding that a plaintiff failed to meet his burden of production to point to specific information identical to the information being withheld).[16]

In light of the recent publication of some of the CENTCOM Releases, however, the Court will afford Osen one more opportunity, if it wishes to take it, to review those releases and meet and confer with CENTCOM to request the disclosure of information, if any, identical to that which CENTCOM has publicly disclosed. As in *Osen I*, the Court "sees no reason to doubt CENTCOM's good-faith efforts to identify the sufficiently public individuals in the redacted material or its continued willingness to work with Plaintiff's in addressing these disputes." *Osen I*, 375 F. Supp. 3d at 427 n.7.

## III. CONCLUSION

For the reasons set forth above, defendant's motion (Dkt. No. 21) is GRANTED IN PART, and plaintiff's motion (Dkt. No. 26) is DENIED. However, the Court will not enter judgment at this time, in order to afford the parties an opportunity to consider whether to further litigate the

---

[16] On reply, Osen points to one name redacted by CENTCOM which appears in the Official History, Pl. Reply Mem. at 7, but CENTCOM has not yet had an opportunity to respond. The parties may revisit the redaction of that name during the meet and confer discussed below.

issues left open above. *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ven when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party.").

The Court will conduct a status conference on **October 24, 2019, at 10:30 a.m.**, in Courtroom 20A, 500 Pearl Street, New York, New York. No later than **October 17, 2019**, the parties shall submit a joint letter (1) addressing any outstanding redactions under Exemption 6 that Osen contends to be of places, organizations, or other non-persons, *see* Pl. Reply Mem. at 4; and (2) proposing a schedule for Osen to provide CENTCOM a list of names and/or photographs it believes are identical to a prior CENTCOM release, and for CENTCOM to respond. If the parties have resolved the issues left outstanding in this Opinion and Order (or believe they will be able to without the Court's involvement), they may request that the conference be held telephonically.

The Clerk of Court is directed to terminate the motions at Dkt. Nos. 21 and 26.

Dated: New York, New York
       September 30, 2019

**SO ORDERED.**

_____
**BARBARA MOSES**
**United States Magistrate Judge**